**SAMINI BARIC KATZ LLP**
Bobby Samini, Esq. (SBN 181796)
Michael Katz, Esq. (SBN 181728)
Steve Baric, Esq. (SBN 200066)
Nicole C. Prado, Esq. (SBN 269833)
John S. Oney IV, Esq. (SBN 338596)
650 Town Center Drive, Suite 1500
Costa Mesa, CA 92626
Telephone: (949) 724-0900
Facsimile: (949) 724-0901
Email: bobby.samini@sbklawyers.com
Email: michael.katz@sbklawyers.com
Email: steve.baric@sbklawyers.com
Email: nicole.prado@sbklawyers.com
Email: john.oney@sbklawyers.com

*Attorneys for Plaintiffs*
*Jane Roe 6 and Jane Roe 7*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROE 6, an individual; and JANE ROE 7, an individual,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>INTERNATIONAL CHURCHES OF CHRIST, INC., a California nonprofit corporation; THE INTERNATIONAL CHRISTIAN CHURCH, INC., a California nonprofit corporation; HOPE WORLDWIDE, LTD., a Delaware nonprofit corporation; THOMAS ("KIP") McKEAN, an individual; THE ESTATE OF CHARLES "CHUCK" LUCAS; NORTH RIVER CHURCH OF CHRIST, a Georgia nonprofit corporation; AL BAIRD, an individual; | Case No. 2:23-cv-00999-ODW-PLA<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>1. **SEXUAL ASSAULT OF A MINOR**<br>2. **VIOLATION OF PENAL CODE 647.6(A)(1)**<br>3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>4. **NEGLIGENT HIRING, SUPERVISION, AND RETENTION**<br>5. **NEGLIGENT SUPERVISION OF A MINOR**<br>6. **FAILURE TO REPORT SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE SECTION 11165. ET SEP.** |

1   ALBERTO SCHIRMER, an indivual;
2   ANNA MARIA SCHIRMER, an
    individual; and DOES 1 through 10,
3   inclusive,

4            Defendants.

    **BASED ON VICARIOUS**
    **LIABILITY**
**7.  NEGLIGENCE**
**8.  VIOLATION OF FEDERAL**
    **RACKETEER INFLUENCED**
    **AND CORRUPT**
    **ORGANIZATION ("RICO")**
    **ACT 18 U.S.C. § 1962(C)**
**9.  SEXUAL BATTERY IN**
    **VIOLATION OF CAL. CIV.**
    **CODE § 1708.5**
**10. GENDER VIOLENCE IN**
    **VIOLATION OF CAL. CIV.**
    **CODE § 52.4**

**JURY TRIAL DEMANDED**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

FIRST AMENDED COMPLAINT

Plaintiffs JANE ROE 6 and JANE ROE 7 (collectively, "Plaintiffs") hereby submit this First Amended Complaint pursuant to 18 U.S.C. §§ 1961 *et. seq.*, the California Civil Code, and the California Penal Code, under federal question and supplemental jurisdiction against Defendants INTERNATIONAL CHURCHES OF CHRIST, INC., THE INTERNATIONAL CHRISTIAN CHURCH, INC., HOPE WORLDWIDE, LTD., THOMAS "KIP" McKEAN, THE ESTATE OF CHARLES "CHUCK" LUCAS, NORTH RIVER CHURCH OF CHRIST, AL BAIRD, ALBERTO SCHIRMER, ANNA MARIA SCHIRMER and all other named and unnamed defendants (collectively, "Defendants") and states as follows:

## **INTRODUCTION**

1. This action to recover damages on behalf of adult victims of childhood sexual assault is governed by Code of Civil Procedure section 340.01 ("section 340.01").

2. The incidents of childhood sexual assault against Plaintiffs alleged herein were facilitated and actively concealed by Defendants while Plaintiffs were minors.

3. This case arises from an ongoing and systemic scheme of abuse that shocks the conscience from its appallingly epic proportions. The ICOC and its affiliate churches have created a money-making enterprise through its psychological manipulation, tight control, and hierarchical "discipleship" structure. That same structure fostered an environment fertile for sexual abuse. Sexual predators gained unfettered access to manipulated women and children. They could abuse them without fear of accountability. Instead of taking action, the ICOC, its leaders, and its affiliates did more than turn a blind eye—together, they actively concealed the abuse in order to protect their mega-church tithing empire. As a result, the ICOC and its leaders, from top to the bottom, aided and abetted the continued sexual abuse of women, minors, and even children as young as 3 years old, some of whom were raped and sexually abused with impunity by trusted church members.

/ / /

## **JURISDICTION AND VENUE**

4.      This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et. seq.*).

5.      Pursuant to Code of Civil Procedure §340.1(q) as amended by Assembly Bill 218, effective January 1, 2020, there is a three (3) year window in which all civil claims of childhood sexual assault are revived if they have not been litigated to finality. This provision provides that, "[n]otwithstanding any other provision of law, any claim for damages described in paragraphs (1) through (3), inclusive, of subdivision (a) that has not been litigated to finality and that would otherwise be barred as of January 1, 2020, because the applicable statute of limitations, claim presentation deadline, or any other time limit had expired, is revived, and these claims may be commenced within three years of January 1, 2020. A plaintiff shall have the later of the three-year time period under this subdivision or the time period under subdivision (a) as amended by the act that added this subdivision." This claim has not been previously litigated to finality; thus, it is timely under the revised provisions of Code of Civil Procedure §340.l(q).

6.      This Court has supplemental jurisdiction over all asserted state law claims pursuant to 28 U.S.C. § 1367 because all state law claims are so related to, and arise from, the same common nucleus of operative facts from which the federal claims arise and, therefore, they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Additionally, the "nerve centers" of the International Churches of Christ, Inc., and The International Christian Church, Inc. are both within the jurisdictional boundaries of the Central District of California.

/ / /

# THE PARTIES

### A.   PLAINTIFFS

8.     Plaintiff Jane Roe 6 is a 19-year-old female citizen and resident of Georgia. Jane Roe 6 was a minor, citizen of the United States of America, and resident of the State of Georgia at the time that she first became a victim and survivor of Defendants' sexual abuse and trafficking.

9.     Plaintiff Jane Roe 7 is a 24-year-old female citizen and resident of Georgia. Jane Roe 7 was a minor, citizen of the United States of America, and resident of the State of Georgia at the time that she first became a victim and survivor of Defendants' sexual abuse and trafficking.

### B. DEFENDANTS

10.    Defendant International Churches of Christ, Inc. (the "ICOC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. The ICOC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. The ICOC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide. This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members, ICOC churches and ICOC affiliate churches worldwide.

11.    Defendant The International Christian Church, Inc. ("ICC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. ICC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. ICC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide. This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings

and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

12.     Defendant HOPE worldwide, Ltd. ("HOPE") was founded in 1994 by the ICOC and is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Delaware, with a principal place of business registered with the Secretary of State for the State of California located at 9449 Balboa Ave. Ste. 311, San Diego, California 92117. HOPE purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. HOPE operates at the specific direction and control of ICOC.

13.     Defendant Thomas "Kip" McKean ("Kip" or "McKean"), upon information and belief, is a United States citizen, currently residing in Pacific Palisades, California. At all times relevant to the events that form the basis of this Complaint, Defendant Kip was a member of ICOC's Los Angeles regional branch, and later, the City of Angels International Church of Christ in Los Angeles, California. Defendant Kip resided in California for extended periods while conducting business in California on behalf of Defendant ICOC and Defendant ICC. Defendant Kip's supervision, direction, and control over Defendants forms the basis of his personal liability.

14.     Defendant The Estate of Charles "Chuck" Lucas ("Chuck" or "Lucas"), upon information and belief, was a citizen of the United States of America and was residing, at the time of his death, in Thomasville, Georgia. At all times relevant to the events that form the basis of this Complaint, Defendant Chuck was a member of the ICOC, and later, formed another church called Cornerstone. Defendant Chuck resided in Georgia for extended periods while conducting business in California on behalf of Defendant ICOC. Defendant Chuck's supervision, direction, and control over the Defendants forms the basis of his personal liability.

15.     Defendant North River Church of Christ ("North River ICOC") is a religious non-profit corporation organized and existing under and by virtue of the laws

of the State of Georgia. North River ICOC purposefully conducts substantial religious and affiliated programs and activities in the State of Georgia. North River ICOC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide. This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide. North River ICOC operates at the specific direction and control of ICOC.

16. Defendant Al Baird ("Baird") upon information and belief, is a United States citizen, currently residing in the Los Angeles metro area in California. At all times relevant to the events that form the basis of this Complaint, Baird is a member and Lead Elder of ICOC's Los Angeles branch, which directs and controls the activities of all other ICOC branches, including but not limited to North River ICOC. Baird's supervision, direction, and control over Defendants forms the basis of his personal liability.

17. Defendant Alberto Schirmer upon information and belief, is a United States citizen, currently residing in Marietta, Georgia. At all times relevant to the events that form the basis of this Complaint, Alberto Schirmer held a leadership position as a Deacon of the North River ICOC. Alberto Schirmer's active concealment of Plaintiffs' abuse, along with his supervision, direction, and control over Defendants forms the basis of his personal liability.

18. Defendant Anna Maria Schirmer upon information and belief, is a United States citizen, currently residing in Marietta, Georgia. At all times relevant to the events that form the basis of this Complaint, Anna Maria Schirmer was a Deacon's wife (i.e., a leadership position) of the North River ICOC. Anna Maria Schirmer's active concealment of Plaintiffs' abuse, along with her supervision, direction, and control over Defendants forms the basis of her personal liability.

19. Plaintiffs are ignorant of the true names of the defendants sued herein as

1   Does 1-10, inclusive, and therefore sue these defendants by such fictitious names.

2   Plaintiffs will amend the Complaint to allege their true names when ascertained.

3   Plaintiffs allege that, at all relevant times herein, Does 1-10 were the co-conspirators,

4   subsidiaries, employees, employers, and agents of constituent members of Defendants

5   herein. Plaintiffs allege that each of the fictitiously named defendants is legally

6   responsible for the actions forming the basis of this Complaint and that Plaintiffs' losses

7   and damages are the result of their wrongful conduct.

8   ## GENERAL ALLEGATIONS[1]

9   **A.    Kip McKean and His Core Leadership Team Spawned a Tightly Woven**

10  **Network of Cult-Like Churches.**

11      20.    In 1979, Kip McKean officially broke off from the traditional Church of

12  Christ—the proto-organization that helped spawn the ICOC.

13      21.    Around that time in Boston, McKean founded what would become the

14  ICOC under the moniker of the "Boston Movement." McKean founded the Boston

15  Movement with 29 other members, who seceded from the Church of Christ based out

16  of Gainesville, Florida.  The fledgling "church" quickly grew, rabidly seeking out

17  new members and enjoying considerable expansion and success. After the Boston

18  Movement obtained religious recognition in the 1980s, it became the ICOC and grew

19  into a multinational movement.

20      22.    Over time, the ICOC morphed into an intricate and intentionally

21  confusing "network of over 700 non-denominational churches in about 150

22  countries." Throughout its history, the ICOC has gone by other names, including the

23  Boston Movement, the Discipling Movement, the Crossroads Movement, and

24  Multiplying Ministries.  Local ICOC churches or assemblies would often append the

25  name of their city, in which they were located, to their name, *e.g.*, the Milwaukee

26  Church of Christ or the Sarajevo Church of Christ.

27  _____

28  [1] For the convenience of the reader, these general allegations are common to the pleadings in each of the following related cases before the Court: 22-cv-09467, 22-cv-09472, 23-cv-0064, 23-cv-00765, 23-cv-00999, and 23-cv-01192.

23.     An ICOC umbrella organization was formally incorporated in California in December 1994. Its Articles of Incorporation filed with the California Secretary of State stated that upon dissolution, "the remaining assets of this Corporation shall be distributed to . . . the individual congregations that are part of the worldwide fellowship of churches of Christ (which are affiliated with the Corporation), if they qualify as distributes under the provisions of this Section."

24.     Chuck Lucas, one of the original founding ministers with Kip in Florida, was eventually paid off to leave the group because of his deviant behavior. Early on, the ICOC and McKean strategically downplayed Lucas's pattern of abuse by labeling his conduct as "recurring sins." Sadly enough, those "recurring sins" were never investigated by ICOC. McKean and other ICOC leaders were acutely aware of Lucas's disturbing pattern of abuse, but nevertheless, they actively concealed Lucas's misdeeds to avert discovery by the police or church members. Covering up for Lucas became the blueprint for the ICOC moving forward, integrating coverups and concealment into its organizational DNA.

25.     In 2006, McKean spun off a derivative church, dubbed the International Christian Church (or "the ICC"), after he was forced out of the ICOC.  The ICC was registered in California as a nonprofit religious corporation in October 2006.  As of December 2022, the ICC listed 104 affiliate churches on its website.  Its Articles of Incorporation, filed with the California Secretary of State, included references to affiliates. One part stated that upon dissolution of ICC, "the assets of this Corporation shall be distributed to other nonprofit funds, foundations or corporations affiliated with the International Christian Church.[23]

---

[2] Between April 2020 and February 2021, eighteen branches of the ICC received Paycheck Protection Program (PPP) loans. These loans totaled $287,490, and a total of $290,040 was forgiven, including accrued interest.

[3] Churches associated with the ICOC appeared to be incorporated into separate entities, according to a review of public records. For instance, the Los Angeles International Church (LAICC), the largest ICOC church by membership, was incorporated in California in December 1990, according to corporate records with the California Secretary of State. The Los Angeles International Church (LAICC) described its structure on its website, noting that it is "organized into eight

**B.     The ICOC Meticulously Crafted an Enterprise That Enabled, Encouraged, and Concealed Sexual and Psychological Abuse.**

26.     Under the direction and control of McKean, the ICOC (and, later, the ICC) has collectively exploited everything good and noble in their trusting and loyal members by callously robbing them of their childhood innocence through psychological coercion and manipulation, pervasive sexual abuse of children as young as three years old, and shameful financial abuse. Each of the foregoing abuses was actively concealed by ICOC and its members to avert discovery by child protective services and the police.

27.     The ICOC was born out of a "discipling" movement that arose among the Churches of Christ during the 1970s.  The ICOC has maintained this practice into present times. It is a strict practice involving a "discipleship hierarchy" centered around a formal discipleship tree—in other words, a top-down authoritarian hierarchy.

28.     McKean co-designed the specific discipling pyramid that would later become the foundational structure of both the ICOC and the ICC as organizations. That pyramid structure served as the mechanism of control and coercion frequently exerted over their members.[4]

29.     Pursuant to that strict and documented discipleship pyramid, every member has an elder disciple preside over them, who acts as quasi-mentor-qua-jailor.

30.     This carefully crafted "discipleship tree" was nothing short of a sophisticated scheme, deeply rooted in psychological manipulation, accomplished by institutionally normalizing the use of aggressive, abusive, and coercive tactics that

---

self-supported regions."  "Each regional evangelist has been given the charge of equipping the brothers and sisters in his part of the LA church (region) to effectively evangelize his area with the saving message of Jesus Christ as well as helping one another mature in Christ."  Notably, "each region has a regional financial advisory group that assists the ministry staff and the Board of Directors with the oversight of the finances in their particular region."

[4] Flavlil R Yeakley Jr. documented the "disciplining" movement in a book titled *The Discipling Dilemma*.  The ICOC and ICC have been classified as toxic, destructive cults due to their rigid and pervasive culture of fear, coercion, control, manipulation, judgment, exclusion, and punishment, along with their overt focus on membership growth (to drive income from tithing).

brainwash members into fearing the loss of salvation for menial transgressions. It allowed the ICOC and ICC to execute and maintain considerable control over every aspect of every member's life.  Members became systematically deindividualized, only to endure communal isolation from the world at large.

31.    Only those members named as "disciplers" were allowed to provide any counseling to church members.  Abuses were reported only to the "disciplers." ICOC church members and leadership discouraged reporting those abuses to outside authorities by routinely branding abuse victims as "disobedient" and blaming them for the abuse they suffered.  Many incidents, which could have reported, therefore never were.

32.    McKean and the ICOC created a religious practice that required victims to confess their "sins" daily.  "Disciplers" would then share the specifics of those "sins" with other groups and leaders to reinforce their control over the victim. This pattern of practice allowed McKean and the ICOC to leverage the abuse as emotional blackmail within the community.

33.    An illustration of the ICOC's hierarchical model of authority is depicted below:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

The ICC had a complex and highly hierarchical organizational structure, unusually so for a relatively new and small religious group. There are many layers of leadership, similar to a pyramid or the Roman Catholic Church.



The ICC has a pyramid-shaped, hierarchical structure of authority. At the top was Kip McKean, the *World Missions Evangelist*, and his wife Elena Garcia-McKean, who served as *Women's Ministry Leader* for the group as a whole. As of November 2002, the Mckeans

## C.    As Designed by McKean, the ICOC Systematically Indoctrinates, Brainwashes, and Manipulates Its Members.

34.    Initially, new recruits receive profound amounts of "love bombing" to lure them into a false sense of security, thereby allowing sexual predators to effectively manipulate them and eventually abuse them with the comfort of knowing that these vulnerable and newly brainwashed people would never report the abuse.

35.    Every new member undergoes a rigid conversion process tantamount to systemic brainwashing, called the "First Principles."  Once a new member agrees to all indoctrination related teachings, the neophyte must be baptized in water and commit to devote their entire life and schedule to the church.

36.    The ICOC trains each new member to understand that "compliance was the path of least resistance."  Members genuinely and wholeheartedly believed that

they needed to follow the Bible verbatim, and that the ICOC's leadership were the only "true" modern-day disciples on Earth.

37.   In addition to the "discipler" structure, the ICOC indoctrinated its members with rigid fundamentalist teachings, demanded unyielding compliance with its instruction, and enforced strict social separation.

38.   The "discipler" hierarchy facilitated McKean and the ICOC's systemic concealment of abuse, created a culture of fear among its most vulnerable, and allowed predators to abuse women and children with impunity.  Their practice of concealment became an institutionalized pattern within the ICOC.  For example:

a.   On information and belief, one ICOC member currently owns a school for autistic children in the San Francisco area.  He has been accused of multiple instances of sexual abuse of adults and children/teenagers while he was in Boston. ICOC and McKean were aware of this despicable man's repeated abuse, but McKean orchestrated his relocation from Boston to San Francisco to conceal his predatory practices and avert criminal prosecution.

b.   On information and belief, non-parties Damon and Vicki James, two ICC "disciplers" working under the specific direction of McKean, instructed a member on July 1, 2018, to refrain from reporting two years of physical and sexual abuse by her husband. Damon James even scolded this survivor and stated, "[w]e don't do that to our brothers as disciples."  Vicki James then victim shamed the woman by stating "[w[]hy would you have the heart to press charges?" Damon continued and told the woman, "[w]hat does that gain? That puts you in front of 'the world'."

c.   Former ICOC member Carter Whitten made the following harrowing statement to an ICOC whisteblower regarding the abuse he endured in connection with his "discipler" experience:

"For reasons I still don't fully understand, my
'discipler' met with me and two other teen boys at

one of the boys' houses. In the basement we sat in a circle, and the goal of my discipler was to break me down and to get me to fully understand the horrors of Hell: Meaning what I had to look forward to if I didn't enter the Kingdom (the ICOC) before I died. So next he took it upon himself to paint a vivid picture for me: My discipler described a scene in hell in which I was nailed to a ceiling by my PENIS and spun around by a demon. Hanging only by my genitals, I was forced to watch the devil RAPE my mother repeatedly for all eternity. I was then asked to take that grotesque vignette and multiply its terror by 10,000 (or some other arbitrarily large number) to catch even a glimpse of how utterly horrifying the future awaiting me was, unless I was to get baptized and be saved. I finally broke down and cried. Which was clearly the goal, as the ICOC famously conducted what they called "breaking sessions."

In addition to completing their entire conversion series of Bible studies, there were even more hurdles I was told I had to clear in order to become a baptized disciple. One is that I had to call the fathers of all the girls in the teen ministry to whom I was sexually attracted, confess my sins of lust after their daughters, and ask for the fathers' forgiveness. I was mortified. I then asked another

teen boy—a good friend of mine, if he had been made to do the same thing before he got baptized. He revealed he had indeed been told to do so, and was terrified by the whole ordeal and shunned by most of those fathers.

The final step was the sin letter or sin list. All disciples-in-training (those studying the Bible) were expected to write an exhaustive letter to God, documenting every single sin they had ever committed in their entire lives and asking for forgiveness. The letter was usually meant to be read aloud in a group setting. I was only 14.

I must have been twelve or thirteen when I realized that almost every conversation or sermon in the teen ministry was talking about lust and masturbation and sexual sin on some level. So now looking back as an adult, I am horrified by how perverse and abusive this culture was. Like many evangelical denominations, the ICOC indulged in purity culture and thus placed a heavy emphasis on sexual purity.

But the ICOC took it to a whole new level, the way that adults dealt with teens in these ministries— children that were not their children—seems criminal to me. At the very least, it was a gross and

egregious abuse of the power dynamic between adults and children. And I know enough people across the country in the ICOC to know that this was not an isolated incident, it was literally happening in every 'teen ministry.'

But even worse than this, I had a friend that was physically assaulted while he was studying the Bible, because he tried to get up and leave. So the teen leader held him down and beat him up.

We had to meet in one-on-one and group D-times, where we had to confess our sins (especially sexual sins) in a group setting, and the disciplers (teen leaders) would sometimes confess sins as well. During one such meeting, an adult discipler confessed to a group of four or five boys that he had a wet dream (nocturnal emission) that week, and in many other meetings we were told by disciplers that masturbation equated to "ejaculating on the cross." I never understood why grown men were spending so much time with boys as young as 12 and 13 confessing all their sexual sins to them… I heard things I had never heard before, and it all felt very abusive and inappropriate to me, even as a child.

Why were grown adults grilling other people's

teenagers for specific sexual details . . . When most of these teens had never even had a sexual experience in their life. The abuse of power here and power dynamics were so damaging to most of these teens in the teen ministry, that the PTSD and anxiety and therapy that most of these children have needed their whole lives is astounding."

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**D.      McKean Structured the ICOC to Maintain Secrecy.**

39.      McKean's carefully crafted church hierarchy lent itself to maintaining secrecy and preventing outside intervention. The following diagram is a rough depiction of the church's organizational structure:



40.      Among other goals, McKean purposefully structured the ICOC's hierarchy to ensure that abuse within the church remained a secret to all outsiders, including the authorities. Indeed, someone within the church was always monitoring lower ranking members and giving them explicit instructions on how to conduct themselves.

41.      McKean and the ICOC's leadership taught, and continue to teach, the doctrine that only fellow church members are "true disciples" of Jesus who will be rewarded with a place in heaven in the afterlife.  Conversely, non-members will not go to heaven because they are not "true disciples." That doctrine engendered an insider-outsider mindset, which allowed scores of sexual predators within the churches to abuse children without fear of criminal prosecution.

42.     The ICOC also created a highly exclusive environment for its members wherein they were/are prohibited from marrying anyone outside the church.  The ICOC must approve all marriages, which ultimately gives it an incredible degree of control—and power—over each of its members.

43.     Questioning higher ranking members or the church in any manner invited damning ostracization. Sometimes, the ICOC would labels those individuals as "disfellowshipped" or "marked" for being divisive. "Disfellowshipped" meant excommunication.  Being disfellowshipped or marked would lead to ostracization and scorn from the ICOC's communities. From the point of view of ICOC doctrine, being labeled as "disfellowshipped" or "marked" equated to being condemned to hell on earth and in the afterlife, too.  Indeed, that communal ostracization and isolation from the outside world inflicted highly debilitating emotional and mental harm to many of their members and, in some cases, drove them to suicide.

44.     But when it came time to judge known or suspected abusers, the ICOC demanded that its parishioners forgive any slight, no matter how severe, and "move on" without reporting such abuses. Judging the conduct of another, no matter how villainous, was beyond the right of any individual, according to McKean and others, because "no one is free from sin," unless they are male members of the ICOC.

45.     Because of the ICOC's strict rules, the expanse of its control over its members' lives, and the severe consequences it could impose on members who questioned its teachings (let alone transgressed its instructions), the ICOC created the ideal conditions for child molesters, pedophiles, and other sexual abusers to fester and thrive.  Furthermore, McKean and other abusers expressly leveraged the ICOC's hierarchical system of authority to insulate predatory church leaders from exposure. Many of those predators continue to prey upon children without fear of repercussion.

46.     It is commonly understood that McKean was acutely aware of the physical, psychological, and sexual abuses that church leaders (like Chuck Lucas and others) wrought upon both children and adult parishioners of the church. Academic

writings, journals, recovered correspondence, newspaper articles, eyewitness accounts, and publications like the book Toxic Christianity—written by former ICOC leading members under the collective pseudonym "Mr. X"[5]—corroborate that fact. These are but a fraction of the litany of sources of information depicting the practices and abuses that the ICOC institutionalized to the point of normalcy within the church.

47.    To ensure that the ICOC's exploitative conduct remain unchecked, McKean, the ICOC, and its leadership have utilized their vast resources to silence any internal dissidents, including through vexatious litigation. The ICOC has created a "David and Goliath" scenario, swiftly suppressing the few members who have spoken up over the last four decades. The ICOC would use its vast resources to silence any internal dissidents, through coercive, deceptive, and threatening tactics to not only force members to give 10 to 40% of their income every month, but also to turn over student loans, IRS tax returns, children's college funds, heirlooms, stocks, furniture, wedding rings, cars, prized possessions, and literally anything that the ICOC could get their hands on. The ICOC grew its resources from nonstop fundraisers, forcing members to put their "special contribution" amounts of thousands of dollars on credit cards, or borrowing it from outside family members.

48.    When many abused victims escaped the ICOC, they were so financially destitute (and emotionally devastated) that they lacked both the financial resources and emotional resilience to take on the ICOC through legal recourse. The ICOC used this to their advantage, as it would help silence any word of sexual abuse.  In short, McKean and the ICOC intentionally created a system of exploitation that extracts all the financial value it can from its members, which it could deploy to further shield their illicit conduct from discovery by outsiders.

49.    The ICOC and its leaders have cajoled, manipulated, and even coerced

---

[5] It is widely believed that Rick Bauer, a former ICOC member and whistleblower, co-published with another church leader under the pseudonym "Mr. X" and can be accessed in its entirety here: http://www.reveal.org/library/theology/Toxic.pdf

parents and other church members to remain silent about the abuses that their children suffered, such as through payoffs and non-disclosure agreements.  The ICOC's affiliate organizations (*e.g.*, its non-profit arm, HOPE Worldwide) also helped insulated abusers from accountability by lending legitimacy to the ICOC's system of exploitation and abuse.

**E.      McKean Grew the ICOC's Ranks to Feed Its Financial Operation.**

50.      McKean and other ICOC leaders were obsessed with growing church membership because more members meant more revenue from income tithing and other coerced, uncompensated labor from adults and minors.

51.      Accordingly, they imposed recruiting quotas on members to help grow their ranks.  The ICOC requires all its members to recruit a certain number of new members on regular intervals, as well as to bring visitors to all church events. Tolerating, concealing, and hiding sexual abusers (while at the same time inviting more abusers into the ICOC's ranks) simply became a cost of doing business.

52.      To incentivize bringing new members into the fold, the ICOC cultivated an atmosphere that isolated its members from other social networks, while concealing the systemic abuse of women and children within the church. Members spent every day together; they were not allowed much, if any, contact with family members or friends who were not church members. Of course, the only exception to that strict rule was contact with outsiders for the sole purpose of their recruitment.

53.      Members were required to give at least 10-30% of their income to the churches *before* they were allowed to be baptized and become an official member.

54.      Thereafter, any member's position, health, and wellbeing in an ICOC church community depended heavily upon success in expanding the congregational rosters. Those social incentives created a self-perpetuating business model to attract new recruits/members, and in doing so, generate hundreds of millions of dollars in revenue for the church through new tithing.

55.      Also, the ICOC forced its members to participate in special contributions

for missions approximately twice a year equaling approximately 40 times their normal tithe amount. The ICOC was relentless in its pursuit for funding and church leadership would resort to interrogating members about their income, going so far as to demand copies of the members' paystubs. By way of example, if a member gave $4,000 per month, the total mission contributions for that year would equal an additional (40x) and the total required sum would be $160,000 in addition to the normal yearly tithe amount of $48,000. This particular member would be required to give the church a whopping total of $208,000 for the year.

56.    Children were also asked to contribute, including their labor for events like car washes or baby-sitting.

57.    On information and belief, the ICOC has collected upwards of $10 to $15 billion in tax free contributions over the past four decades.

58.    If the tithing budget was not satisfied, the ICOC forced its leaders or "disciplers" to contribute the financial shortfall themselves.  Examples of the ICOC's pattern of coercive tactics to enforce non-consensual tithing include, but are not limited to, the following:

a.    The ICOC put members, who failed to tithe, on a "weak and struggling list," a list which was known to all ICOC leaders.  If the "weak and struggling" member did not eventually repent and repay the tithe, the ICOC "disfellowshipped" him or her.

b.    The ICOC would ask its members to locate members who failed to tithe and peer pressure them into tithing, for example, by sitting on their porch and waiting until they arrived home to collect the money.

c.    In 2005, two former ICOC members filed a suit in Tennessee claiming the church uses cultlike tactics, manipulation, peer pressure and guilt to force members into tithing and making other financial contributions.  They alleged that for personal gain, "the Nashville Church, the [ICOC], Hope Worldwide, and Central and South America World Sector jointly participated in a scheme to defraud

church members, who are not allowed to inspect the church's financial records."

        d.     A former member (who only wishes to go by Tina C.) witnessed Non-Disclosure Agreements being forced upon parishioners, claiming that they could never talk about the true finances of the Defendants despite evidence that ICOC opened offshore accounts containing massive quantities of cash.[6]

59.    The pressure to comply with the church's rigid demands became a source of anxiety and depression for many members—so much so that several ex-members committed suicide.

60.    In furtherance of efforts to protect the church and its primary source of revenue (*i.e.*, its members) at all costs, McKean and the ICOC used psychological manipulation to conceal the incidents of abuse. ICOC members routinely read scripture to discourage "dragging brothers into court." For example, McKean told members of the ICOC, including the mother of Jane Roe 8, that:

> "We cannot report these abuses, because it would hurt our church, which is God's Modern-Day Movement."

> "Do you want the fall of God's modern-day movement on your head???!!"

> "The cause of protecting God's Kingdom on earth is more important than the sin or the pain of a few individuals."

> "We need to forgive our brothers who sin and realize that they are a new creation in Christ, and give them a chance to make things right. If we report them, it will destroy their lives and hurt the church."

61.    In addition, the ICOC engaged in strategic victim blaming and victim

---

[6] Top leaders of the ICOC put "different ICOC assets and properties in their names" in order shelter and hide those assets "so that the church didn't specifically own them." For example, The Bay Area Christian Church listed its address at the location of the HOPE Technology School for Autistic Children, which was owned by Bay Area Christian Church executive minister Russ Ewell. As of 2022, the property had a total assessed value of $7.7 million, all of which was exempt from taxes under an "other" exemption. The Bay Area Christian Church also received a PPP loan of $764,600 in April 2020.

shaming. For example, ICOC leaders blame victims for bringing on their suffering because their clothing was too provocative, they were supposedly disobedient, or that they did not listen to the ICOC's advice.

62.    Through this combination of tithing, labor contributions, and concealment of crimes through fear, coercion, and manipulation, McKean and the ICOC managed to operate a highly profitable pyramid scheme.

63.    A web of paper corporations and alter ego 501(c)(3) entities supported that pyramid scheme, culminating in hundreds of millions of dollars in illicit gains. The full extent of the ICOC (and the ICC's) profiteering is unknown, especially in view of the tithing and labor contributions that the ICOC and the ICC routinely coerce from their members.

64.    Plaintiffs are aware that the ICOC and the ICC have also benefitted from millions in governmental support through SBA loans, authorized under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).[7]  Through their abuse of the corporate form and systematic exploitation of their members, the ICOC and the ICC have created literal cash cows built upon layers of lies and deceit.

65.    McKean actively solicited church members to turn over their COVID-19 relief money to the church. The following are excerpts of emails from McKean to various church elders and leaders:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[7] During the COVID-19 pandemic, branches of ICOC received 77 Paycheck Protection Program (PPP) loans, totaling over $9.4 million. Over $9.2 million of those loans were forgiven, including accrued interest. *See* https://projects.propublica.org/coronavirus/bailouts/ for more information.

**Here are my charges for the USA Churches:**

1. Call your members to give their stimulus checks ASAP. Americans are known to spend everything in their accounts. The great Chicago Church has called these $1,200 checks "Manna from Heaven!"

Presently, all around the world, if a member misses 2 or 3 weeks – usually recognized by missing 2 or 3 weeks of weekly contribution – this is a red flag that they may have become unfaithful. (There of course are always exceptions.) It is a fact that almost every USA Disciple has the ability to give online. So discipling in the COVID-19 Era must include how to give one's weekly contribution online.

Therefore, in the COVID-19 Era to show more forbearance and grace, if a person on your membership has not given for 4 straight weeks – remember this is the USA Churches not third world like India, the Philippines, Africa and some nations of Central and South America – then we must have the conviction that they have become unfaithful to God. At this point, after consulting your World Sector Leader then a decision needs to be made concerning the removal of their name from your membership. However, before that is done, the Evangelist or Women's Ministry Leader must contact them to see if there are extenuating circumstances. Take each situation on a case by case basis.

66.     HOPE, a sham charity organization, is one example of a tax-exempt corporation under the ICOC's and the ICC's corporate umbrellas.  HOPE has generated over $100 million in revenue over the last six years.  It continues to generate a substantial share of its tax-free revenue from its members using substantially similar methods of the ICOC and the ICC, which are characterized by the tax-deductible contributions from third-party corporations and high-net-worth individuals.

**F.     McKean and His Churches Used Children's Ministries to Extend the Abuse Enterprise.**

67.     The ICOC's children's ministry, named the "Kids Kingdom," further insinuated the ICOC into the lives of its members and their children.

68.     The ICOC built a culture of child grooming.  Children were taught from a very young age to "obey" their ICOC elders or face corporal punishment.  The ICOC indoctrinated the children under its control to therefore obey adults and authority

figures unquestioningly.

69.     Those policies, practices, and norms allowed the ICOC and its Kids Kingdom, in particular, to become fertile grounds for sexual predators.   Countless instances of abuse happened within the Kids Kingdom ministries themselves, during its hosted mission trips (*e.g.*, HOPE Worldwide trips), and other related religious and social events.

70.     HOPE took teenagers on mission trips around the world to spread God's Word. Many of these children thought they were participating in an evangelical trip. Ultimately, many, including some of the Plaintiffs, were sexually abused by vile adult men. Children and/or their parents reported the sexual abuse, including rape, to elders and doctors (*i.e.*, mandated reporters) within the church, but the church never bothered notifying the police of the illegal activity. There were no instances of any ICOC medical doctors reporting the abuse to anyone, let alone anyone outside the church.

**G.     McKean and His Churches Encouraged Physical Abuse of Children Under the Guise of Discipline.**

71.     In addition to sexual abuse, children in the care of ICOC (and ICC) staff were routinely physically abused under the pretext of "discipline."   The ICOC also instructed the parents to routinely physically abuse their children under the pretext of discipline.

72.     Church leadership often recited the following commonly known passage from Proverbs 13:24 as justification for child abuse: "Those who spare the rod of discipline hate their children. Those who love their children care enough to discipline them."


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

73.    For example, the ICOC instructed its members to spank children, including infants, with a wooden paddle or spoon. Pictured is an example of a custom-made ICOC paddle with a heart shaped hole in it. A true and correct image of the heart shaped paddle is depicted below:



74.    Members were instructed, with visuals, on how to use corporal punishment without leaving bruises, welts, or red marks, so the offending members could not be reported to child protective services. One former member recalls frequently seeing young children at church with welts or bruises on their thighs. On one occasion, this member witnessed a child with a "heart shaped welt" on his/her body.

/ / /

/ / /

**H.      Defectors are Beginning to Corroborate the Abuses Publicly, and Experts are Taking Note.**

75.      McKean and his team of capable, well-educated henchmen convinced nearly everyone within his churches to remain silent for the last 43 years. That silence has come to an end.

76.      Some ICOC members were fortunate enough to escape the church's tight grasp and successfully flee the toxic and harmful environment that McKean created.

77.      According to some of the most respected cult experts around the world (such as Dr. Steve Hassan, PhD), the ICOC and ICC are some of the most dangerous cults in existence. The danger arises primarily because the church insidiously masquerades as the approachable 'church next-door' with deeply rooted Biblical foundations. On its face, this public image of the church seems innocent.  But the church's internal machinations are characterized by unmitigated systemic and chronic physical and sexual abuse of children and women within the church.

78.      Defectors have since revealed the abuse they suffered or witnessed at the ICOC.  For example:

        a.      Former member (and non-party) Lisa Johnson was a top leader in New York City and a friend of McKean.  In a podcast called *Eavesdropping*,[8] she made the following comments regarding the ICOC based on her personal experience: "Women [in the ICOC] are getting ground up, and I mean tons of people, it's not an isolated case here and there . . . And I think about these women now, after all these years . . . So I'm gonna bring up something here.  . . . There has been sexual abuse, there has been emotional abuse, and there has been some physical abuse of women . . . and part of that is the issue of patriarchy. We developed a system and a way that was not safe for women . . . There are women that have been very damaged and ground up

---

[8] The podcast may be accessed from YouTube from https://m.youtube.com/watch?v=mqhs4GJ1D-s&pp=ygUsU3RldmVuIGxlc2xpZSBqb2huc29uIExpc2EgbXkgTGlzYSBhbmQgU2hhcmsk%3D.  The statements begin at the 44:40-minute mark and last for about four minutes.

by that.  The fruit of this is so obvious, how can you miss it? How many women have been told to stay with their physically abusive husbands and how many women have been sexually abused?"

        b.     In a 2022 podcast with Steve Johnson,[9] another ICOC defector, James Lloyd, explained the irony of Lucas's pedophilia with young men when the ICOC had implemented its own a LGBTQ+ conversion therapy ministry:

> "The truth is the foundational—what I call—"original sin" of our movement was homosexuality. Man on man.  Specifically, male older leader on young intern . . . Not a few times . . . You can find out, it's not like nobody knows. The fact that our sin, our original sin, was a senior leader [Lucas] who is respected and loved and training a group of young men.  They get in a room and shut door and then this senior leader [Lucas] 'puts the moves' on these young men. And it's worse than it sounds because those men became ministers and went out into their churches and some of them did the same.  And I know that because I was in some of those meetings where it was confessed!
>
> We [the church leadership] thought it was best not to ever share that with everybody, and I heard all the reasons and I bought into them: 'He's got children, you know.' 'He's got children, he's got a wife.' 'You don't just say those things . . . it could hurt the faith of a young Christian.'
>
> All those things are hierarchy saying, that's patriarchy saying, that we don't need to bring this thing up about men on men.  But I'm telling you,

---

[9] The podcast may be accessed from Facebook at https://www.facebook.com/watch/live/?extid=CL-UNK-UNK-UNK-IOS_GK0T-GK1C&mibextid=2Rb1fB&ref=watch_permalink&v=1109647602942209. The statements begin around 29:00-minute into the clip and continues to the 31:30-minute mark.

one of the problems—and one of the reasons why I call it "original sin"—
I don't think that that sin is any different than if it had been a man and a
woman, by the way, that's not married.  But the fact that we hid it.  You
laughed at the word 'transparent.'  That's what we needed. . . We needed
to be hearing about that.  People should be taught that that's how things
started in our group.  And some of that has continued for three generations.
. . . Some of that trauma was carried on, was passed on to other men as
those men went out to start their churches. . ."

## I.   The ICOC and the ICC Refused to Report Numerous Pedophiles Who Were Later Arrested.

79.   At least ten pedophiles have been arrested in connection with abuses
linked to the ICOC or ICC. Described below, these individuals committed numerous
crimes before the police intervened.  On information and belief, they represent only
miniscule fraction of the true number of predators who have operated with impunity
within the ICOC since 1979.

### 1.   David Saracino

80.   In January 2012, Defendant David Iburg, *a/k/a* David Saracino
("Saracino"), was sentenced to 40 years of hard labor in the State of Louisiana, the
maximum sentence, for the **forcible rape of a 4-year-old girl in 2004**.[10] The
prosecutor, Cynthia Guillory, told the judge that he was among the worst of the worst.
Saracino purposefully sought out women with financial problems so he could gain
access to their small children, who became his victims. He had charges and convictions
in Texas, Utah, and Louisiana, where he received the 40-year sentence.[11]

---

[10] *State v. Iburg*, 12-2720  (La.  5/17/13), 118 So.3d  372.

[11] For more information, *see* Theresa Schmidt, *Prosecutor to child rapist: You're the worst of the worst*, KPLC News (Jan. 6, 2012), last accessed June 13, 2023 from https://www.kplctv.com/story/16464797/man-gets-40-years-for-raping-a/?outputType=amp.

81. Saracino attended the East Region of the Los Angeles ICOC, where several members (single mothers) of the ICOC reported to the leaders in the East Region in or about 1998 that Saracino had continuously molested their daughters. Ultimately, several police reports were filed by the parents, while the ICOC remained silent. Just as the ICOC did nothing to address these reports, Saracino escaped to the San Diego ICOC and freely resided in the Escondido area, temporarily, until fleeing again.

82. For a time, Saracino disappeared. He was free to go on a nationwide crime spree, abusing and raping little girls along the way. Saracino was finally caught, but only after an episode of America's Most Wanted produced credible leads that resulted in his capture.

83. Like so many others, the mothers of the victims were told not to share with anyone else what Saracino had done, as it would "hurt the church."

84. Had the ICOC assisted in his arrest or alerted their congregations, Saracino could not have continued abusing children with reckless abandon. On information and belief, the ICOC intentionally, willfully, maliciously, and recklessly knew of his proclivities without warning parents, concealed his whereabouts, and enabled his escape from authorities.

**2. Waldo Milla-Guerra**

85. In or about February 2018, a volunteer soccer coach named Waldo Milla-Guerra of Middlesex County, New Jersey, was arrested on charges of possession and distribution of child pornography. Milla-Guerra volunteered at the South Brunswick Soccer Club and formerly taught at Kid's Kingdom at Central Jersey Church of Christ in North Brunswick.

**3. Benjamin Samuel Speights**

86. In 2005, Benjamin Samuel Speights, a member of the south region Los Angeles ICOC, was convicted for lewd and lascivious acts against a child under the age of 15.

87.     Speights' unlawful conduct included forceable participation of a 14-year-old girl to create pornographic videos that he sold.

88.     In December 2020, Speights was convicted in Arizona in connection with a Class 2 felony of sexual exploitation of a minor as part of a negotiated plea deal related to child pornography charges.  Speights was a leader in the "Kid's Kingdom" ministry in the El Segundo South Region of the Los Angeles ICOC church.  Several children at this ministry reported his physical abuse, but neither the ICOC nor its ever reported the abuse that those children endured or attempted to prevent future abuses.

**4.     Nicholas Griffin Lombardi**

89.     Nicholas Griffin Lombardi is another example of a known pedophile abusing children within the ICOC's churches. He was a long-standing member of the ICOC, as were his parents.

90.     On or about November 27, 2022, Lombardi posted on his personal Facebook page "I kind of have a fantasy of fucking a child ha[.]"

91.     Lombardi was convicted for lewd and lascivious acts against a child under the age 15. In addition, there are numerous accusations of abuse against Lombardi. And yet, the ICOC refused to report his abusive conduct to the authorities.

**5.     William (Bill) Thomas McLaughlin**

92.     In approximately August 2011, one ICOC abuser, William (Bill) Thomas McLaughlin, was sentenced to 6 years to life, followed by 10 years to life of parole for various counts of felony sexual assault on a child by a person in a position of trust.[12] He abused approximately ten to fifteen individuals, all of whom were expelled or in some fashion pushed out of the Denver ICOC as punishment for failing to comply with the leaders' commands.

---

[12] For more information, *see* Rhonda Moore, "Denver man sentenced in Douglas County for sex assault on child" *Castle Rock News-Press* (Aug. 16, 2011), last accessed June 13, 2023 from https://castlerocknewspress.net/stories/denver-man-sentenced-in-douglas-county-for-sex-assault-on-child,117951.

**6.      Tomotaka Andrews Wilton**

93.      Tomotaka ("Tom") Andrews Wilton of the Portland, Oregon ICC location raped a child for years. [13]

94.      Church leaders, including McKean, were acutely aware of the abuse but did nothing to warn anyone regarding this despicable predator's presence.

95.      In 2009, he was convicted in Idaho of two counts of third-degree rape of a child and is now a registered sex offender. On information and belief, Wilton remains a member of the Portland ICC.

**7.      Karim Torres**

96.      Karim Torres was convicted of indecency with a child by contact.

97.      On information and belief, he is currently a registered sex offender.

98.      On information and belief, he serves as a Bible talk leader at several Texas ICOC locations. He and his wife are known to frequently visit other ICOC churches as speakers at family retreats.

**8.      Warren Inman**

99.      Warren Inman was convicted of at least three counts of indecency with a child in or about February 2021 in Denton County, Texas, Case No. F-2012-0728-D. He was a member of the Dallas ICOC and lives in Denton County.

100.    He was a worship leader and allowed college students to live in his home, as he regularly had college worship group meetings at his home. Inman has been in and out of prison and was finally arrested for child molestation. On information and belief, the ICOC neglected to report him to the police.

**9.      Joseph Ursini**

101.    Joseph Ursini has multiple arrests and has been in and out of the ICOC fellowship over the years. On information and belief, none of the Texas ICOC

---

[13] For more information, *see* the Idaho State Police offender profile, last accessed June 13, 2023 from: http://www.isp.idaho.gov/sor_id/SOR?id=35071&sz=1360; https://www.homefacts.com/offender-detail/IDSX35071/Tomotaka-Andrews-Wilton.html.

churches, including the Dallas location, have ever reported Ursini's criminal conduct to the relevant authorities.

**10.    Luis Miguel Quiroz**

102.   Luis Miguel Quiroz was the subject of several individuals' reports to ICOC regarding extreme sexual abuse of several minors. However, the church did nothing.

He was finally arrested approximately ten years after the reports were made to the church. Luis is the brother of Dr. Carlos Quiroz, an ICOC pediatrician.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

# SPECIFIC ALLEGATIONS

**A.    The Sordid History of Chuck Lucas**

103.    When Chuck Lucas became involved with the ICOC, he was a licensed psychologist at the time.

104.    It is commonly understood that McKean, was acutely aware of, the physical, psychological, and sexual abuses Lucas and other church members wrought upon children and adult parishioners.   ICOC and McKean strategically downplayed Chuck's pattern of abuse by labeling his conduct as "recurring sins." Sadly enough, these "recurring sins" were never investigated by ICOC.[14]

105.    After Lucas was paid off to leave the ICOC due to his deviant behavior, he led CrossRoads Church of Christ in Gainesville, Florida.

106.    Lucas died in August 2018.   However, Plaintiffs and scores of members witnessed his ongoing abuse of children and adults within the congregation through the end of his despicable life.  Sam Laing, one of Lucas's continued faithful supporters and a prominent lead evangelist with ICOC, was aware of Lucas's deeply disturbing abuses and its chronology. Sam Laing recently made a statement about Chuck in a 2018 article published in "Disciples Today," which is an ICOC owned platform/news source: ""Chuck Lucas was a man of deep conviction. He was a disciple of great courage and perseverance. He was criticized, persecuted and attacked for what he stood for, but he never quit. Yes, he had his weaknesses and failures along the way, but he, by grace, repented and overcame them, and was restored."[15]

**B.    Plaintiffs Were Tortured and Abused At Ages 5 and 9**

107.    On or about September 21, 2008, Plaintiffs' mother was approached by a deacon's wife, Sheila Grubb, also a leader in the ICOC, at a party she was hosting for

---

[14] Ryan Britt, *History Repeats Itself: The Rise and Fall of Kip McKean & Chuck Lucas*.  Last accessed on December 29, 2022 from: http://www.reveal.org/library/history/britt2.html.

[15] Sam Laing, *Chuck Lucas: A Servant of God* (2018). Last accessed on December 29, 2022 from: https://www.dtodayarchive2.org/chuck-lucas-gods-servant-and-how-he-used-him

moms of special needs children. Sheila said: "one of the boys from across the street is messing with your baby girl. I saw him this morning at church; he led her behind a door leading into the auditorium."

108.   Plaintiffs' mother immediately spoke with her youngest daughter, who was 5 years old and in kindergarten at the time. Jane Roe 6 burst into tears and said, Ian Schirmer "won't stop". Ian told her, "don't tell anyone" and "this is how I show you I love you". On information and belief, Ian was approximately 10 years old when he sexually abused Plaintiffs in various locations, including but not limited to church-owned facilities.

109.   Immediately, Plaintiffs' mother understood why Jane Roe 6 had been falling behind in school the prior month. Jane Roe 6's teacher and Plaintiffs' mother had recently met to discuss concerns regarding Jane Roe 6's lack of progress at school.

110.   Plaintiffs' mother asked Jane Roe 7, who was 9 years old at the time, if she had been abused and she confirmed that she had also been abused by Ian Schirmer in the same manner as her sister.

111.   Ian sexually abused Plaintiffs by aggressively groping them and touching their bodies in a sexual manner. Ian told both girls they were not allowed to say no to his touching and groping.

112.   Ian Schirmer's parents are Alberto and Anna Maria Schirmer and the Schirmer family attended the North River Church of Christ ("North River ICOC")[16], an ICOC church in Marietta, Georgia. Alberto Schirmer was in a leadership position as a Deacon at North River ICOC in or about the time Plaintiffs' abuse occurred.

113.   On or about September 22, 2008, Plaintiffs' mother spoke with Alberto and Anna Maria Schirmer regarding Plaintiffs' abuse. When Plaintiff's mother disclosed the abuse she discovered the day before, Anna Maria looked at Alberto and said, "I guess this means the other stuff at school is true then."

---

[16] https://nrcoc.org

114.   Plaintiffs' mother bluntly asked Alberto and Anna Maria, "has he done this before? You could have told me so that we could have installed further safety measures." They both reacted calmly and in an unalarmed, yet calculated manner. After this meeting with the Schirmers, Plaintiffs' mother immediately went home and began searching for help for her daughters. She called a counselor at North River ICOC, Steven Brand, who on information and belief was/is a licensed therapist, and someone that the ICOC recommended and used to counsel its members in a professional capacity. When Steven Brand gave advice, church members were expected and directed to take that advice. Upon hearing which of the Schirmer children (they had twin boys) abused Plaintiffs, Steven said, "they have got to get a hold on that boy." This telling, but simple statement conveyed a disheartening fact to Plaintiffs' mother: church leadership was already aware of Ian's pattern of abusing other children. Steven told Plaintiffs' mother they should "talk again tomorrow" about the situation. Steven Brand, a counselor and mandatory reporter, never reported the abuse to anyone.

115.   Plaintiffs' mother also went to Plaintiffs' school, Eastside Elementary School, spoke with a school counselor and specifically requested assistance in keeping Ian away from both girls. The school counselor listened and said, "I don't need the boy's name I think I know who it is." Plaintiffs' school had approximately 1,200 students at the time in grades ranging from Kindergarten to 5th grade, however, among such a large student body, this counselor knew the perpetrator's name without Plaintiffs' mother disclosing his name. The counselor helped Plaintiffs' mother create an action plan and the counselor also reported the abuse to the Department of Family and Children Services ("DFACS"). She recommended SafePath Children's Advocacy Center ("SafePath") in Marietta, Georgia, as a safe space to obtain help for Plaintiffs in connection with the abuse they endured

116.   On or about September 23, 2008, Plaintiffs' mother received a call on her lunch break from Steven Brand and he said, "I've known Anna Maria for years going back to Boston where we were in the same family ministry group, so I don't think I

can help you with your girls." Plaintiffs' mother was completely stunned that a mandatory reporter such as Steven Brand would refuse to report child abuse because of his personal relationship with the abuser's mother.

117. Later that evening on September 23, 2008, Lin Beaty Ottenweller, a women's ministry leader in the ICOC and registered nurse, visited Plaintiffs' home and stated she wanted to help Plaintiffs' mother with Plaintiffs. Plaintiffs' mother asked for Lin's help in convincing Anna Maria to drive the twins to school so Plaintiffs would not be forced to confront their abuser 5 days each week during the bus ride to school. Plaintiffs' mother made this request of Lin because when she previously asked Anna Maria to personally drive the twins to school, Anna Maria refused and stated that her "boys really enjoy riding the bus." Lin Beaty Ottenweller was at all relevant times a registered nurse and clergy member, and as a result, a mandatory reporter. Lin failed to report the abuse to DFACS.

118. On September 24, 2008, Plaintiffs' mother received a call from Detective Adamchek from the Cobb County Crimes Against Children Unit and they scheduled a time for him to interview Plaintiffs at SafePath.

119. On September 30, 2008, Anna Maria Schirmer came to Plaintiffs' home and spoke with Plaintiffs' mother. Anna Maria asked, "when you talk to your girls how do you question them?" Anna Maria's question clearly insinuated that Plaintiffs' mother had installed false narratives in Plaintiffs' minds regarding the abuse. Plaintiffs' mother responded, "you think I would want my girls to think they are victims of sexual assault if it didn't happen to them?" Plaintiffs' mother then asked Anna Maria to "please leave [her] home now and don't ever step foot on [her] property again!"

120. On October 1, 2008, Plaintiffs and their mother went to SafePath to be interviewed by Detective Adamchek. He interviewed Plaintiffs and their mother separately for approximately an hour each. Detective Adamchek requested Sheila Grubb's phone number so he could obtain a witness statement from her.

121. On October 5, 2008, Lin Beaty Ottenweller visited Plaintiffs' home

because, she said she was concerned Plaintiffs' mother was receiving advice outside of North River ICOC and, therefore, not receiving "Godly advice." Plaintiffs' mother informed Lin that the family was receiving help from experts in the field, including Detective Adamchek.

122.  On October 8, 2008, Plaintiffs' mother received a call from an angry Sheila Grubb who was upset because she received a voicemail from Detective Adamchek and she did not want to be involved in the situation.

123.  In November 2008, a meeting between the elders and Plaintiffs' mother was held at Plaintiffs' next-door neighbor's home. The next-door neighbor was also a member of North River ICOC and the following individuals were present at the meeting: Plaintiffs' mother, Kevin and Echo Garrett, Ken Furlong (elder), Ross Mckenzie (elder) Thom Bogle and Bob Keen (elder and attorney). Thom Bogle was the only individual Plaintiffs' mother did not know personally; he and his wife had recently moved to Georgia from the New York City ICOC. Plaintiffs' mother later learned that Thom Bogle was a new elder at North River ICOC and Thom had received an endorsement from Tom and Kellie Brown, who were leading the North River ICOC at the time. Plaintiffs' mother shared with the group what Plaintiffs had endured and Echo Garrett responded by sharing how ICOC leadership showed no concern regarding Plaintiffs' inhumane abuse.

124.  During the meeting, the elders had little to nothing to say about Plaintiffs' abuse. However, Ross McKenzie said, "someday soon your girls and the boys (Ian) across the street can play together again!" This calloused statement horrified Plaintiffs' mother and she quickly told the group that Plaintiffs would never play with the Schirmer boys ever again. None of the leaders at this meeting in November 2008 ever reported Plaintiffs' abuse.

125.  On November 13, 2008, Detective Adamchek called Plaintiffs' mother and asked to take photos of the family home. He arrived with 2 other detectives in an all-black vehicle. Plaintiffs' mother told Detective Adamchek about the feedback she

received from North River ICOC staff and leaders and he curtly said, "your family should have no contact with anyone in that family, they are truly dangerous to you." Plaintiffs' mother was floored that an "outsider" had such strong views about the Schirmer family, yet not a single member or leader within the North River ICOC shared this opinion. Indeed, it felt like everyone at North River ICOC fiercely protected the Schirmer family instead of Plaintiffs. Detective Adamchek told Plaintiffs' mother that he caught Alberto Schirmer in a lie and Anna Maria was "covering" for Alberto. Detective Adamchek told Plaintiffs' mother that the police department should have received multiple reports from North River ICOC, however, they had not received a single report regarding Plaintiffs' abuse.

126.   In December 2008, Plaintiffs' mother spoke with the mother of a little boy who was also abused by Ian Schirmer at Eastside Elementary School in approximately 2007. This mother said her experience dealing with the Schirmer family was horrific and she felt the family was hiding something. She was frustrated that she had no success convincing anyone at Eastside Elementary School to restrict Ian's activities to protect the other children from his abuse. After discussing her concerns with the school counselor, the school counselor told Plaintiffs' mother, "good luck trying to get accommodations concerning that boy, cause his mom [Anna Maria] is at the school on a weekly basis making sure her son has his freedom!"

127.   In January 2009, roughly three months after Plaintiffs' mother first learned of Plaintiffs' abuse, Kellie Brown called Plaintiffs' mother to schedule a meeting with the new North River ICOC Elder, Thom Bogle, at his home. Plaintiffs' mother refused because she stopped attending the church and did not consider Thom Bogle her Elder. Kellie stated that the Elders wanted to apologize to her because they realized they mishandled the situation concerning Plaintiffs' abuse. She begged Plaintiffs' mother to meet and suggested that the meeting could help the family heal. Reluctantly, Plaintiffs' mother agreed to meet with the Elders and Kellie agreed to attend the meeting to support Plaintiffs and their mother.

128.   The January 2009 meeting at Thom Bogle's house also included Lin Beaty Ottenweller, Kellie Brown, and Thom's wife, Gail Bogle. Lin commenced the meeting by telling Plaintiffs' mother she was concerned that she was not helping Plaintiffs "heal and forgive". Lin alleged that Plaintiffs' mother was trusting people in the "world" rather than the ICOC spiritual leaders who loved and cared for the family. Taken aback by the group's assault on her parenting abilities, Plaintiffs' mother responded, "are you seriously going to sit there and tell me I'm not a good mom to my girls because I'm seeking help from experts in the field of pediatric sexual abuse, and I have the backing of the Crimes Against Children unit of the Cobb police!"

129.   Thom Bogle then presented a document to the group, stating, "I have a letter from a child psychologist in Athens saying that the abuser, Ian Schirmer, is not a threat to other children." Plaintiffs' mother immediately responded, "are you talking about the therapists named the Shapiros? They are ICOC members, and are developmental psychology therapists, and not trained in child predator situations! The Shapiros have been seeing Ian once a month for many years, so this abuse happened on their watch! They are not qualified to make that assessment!"

130.   Thom Bogle then replied verbatim to Plaintiffs' mother: "what happened to your girls isn't that big of a deal, as most girls have been molested by the time they reach 18."

131.   Thom told Plaintiffs' mother, "we don't need you at North River, or your friends, as we have 60,000 square feet of building space, and people are moving in every week." Plaintiffs' mother took her cue from Thom and immediately left his home.

132.   In September 2009, Plaintiffs and their mother attempted to attend Ian Schirmer's court hearing regarding the abuse. The prosecutor told Plaintiffs' mother, "this boy comes from a wealthy family and they have good representation." Plaintiffs' mother responded and said, "she knew the family was not wealthy because she made more money than Alberto Schirmer." On information and belief, Thom Bogel, a

wealthy individual, funded Ian Schirmer's defense costs.

133.   In September 2010, word began spreading in the community that other abuse survivors came forward to expose abuse by Thom Bogle that the church actively concealed. After these other survivors publicly disclosed their abuse, Plaintiffs' mother discovered that Thom Bogle had an extensive history of abusing young men in ministries he oversaw. When survivors reported Thom's abuse to church leaders, they were immediately victim shamed and church leaders minimized their experiences by calling the abuse "David/Jonathan" "affairs." These church leaders never reported the abuse to the authorities.

134.   Jeff Hickman, a staff evangelist at North River ICOC, was assigned to help Plaintiffs' mother as a "friend" after she left the ICOC to keep an eye on her. After learning about Thom's history of abusing young men, Plaintiffs' mother demanded to Jeff Hickman that Bogle be removed as an elder and as a board member of the church's children camp called The Swamp. Plaintiffs' mother, desperate to save other innocent people from Thom's abuse, contacted the Survivors Network of those Abused by Priests ("SNAP") to obtain help in exposing North River ICOC's deeply rooted and repeated coverup of abuse within the church. At the time, Plaintiffs' mother was told that exposing the church would require the cooperation of multiple victims, so unfortunately, SNAP was unable to help her at that time.

135.   In or about December 2010, Al Baird, Lead Elder for the Los Angeles ICOC, also commonly known as the ICOC "fixer," flew to Georgia for a meeting with the wife of one of Thom's abuse victims, to represent the ICOC Elders Group. On information and belief, Al Baird was in a meeting in Boston with Thom regarding this same victim Thom abused in the 1990's. This victim tried on multiple occasions to obtain help from the ICOC leadership, however, nothing happened and **Thom was allowed to continue his abuse unabated with the ICOC turning a blind eye**.

136.   On January 17, 2011, Plaintiffs' mother received a text from Jeff Hickman telling her that Bogle was removed as an Elder at North River ICOC. North River

ICOC announced to the church that Thom was removed because "someone from Bogle's past had come forward and is unforgiving." Therefore, **North River ICOC concealed the assaults and never informed the congregation that Thom's sexual abuse victim came forward or that Thom abused multiple individuals while he was a campus minister**.

137.   As a result of the abuse, Jane Roe 6 experienced severe trauma throughout her childhood. For example, Jane Roe 6's school performance went from stellar to requiring that she repeat the first grade. Her trauma culminated in her teen years and is ongoing to this day.

138.   Plaintiffs have continuously seen psychotherapists from the time of incident to the present and both have struggled with flashbacks, severe depression and other related conditions.

139.   As a direct and proximate result of Plaintiffs' abuse, they suffered and continue to suffer a litany of injuries. Among other injuries, Plaintiffs have experienced and will continue to experience damages, including but not limited to, severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

## FIRST CLAIM FOR RELIEF
## SEXUAL ASSAULT OF A MINOR
*(Against All Defendants and Does 1-10)*

140.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

141.   Defendants intentionally, willfully, and maliciously sexually assaulted and/or sexually abused and molested Plaintiff during the time that Plaintiff was a minor.

142.   In committing the unlawful acts of sexual assault against Plaintiff, Defendants intended to put Plaintiff in imminent apprehension of harmful or offensive

contact.

143.   Defendants put Plaintiffs in imminent apprehension of such harmful offensive contact as Plaintiffs actually believed Defendants had the ability to make harmful or offensive contact with plaintiff's person.

144.   Plaintiffs did not consent to Defendants' intended harmful or offensive contact with plaintiff, Defendants' intention to put Plaintiffs in fear of imminent apprehension of such contact, plaintiff was a minor during the time herein alleged and, therefore, lacked the ability to consent to sexual contact with any person, including Defendants.

145.   As a direct and legal result of this conduct. Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

146.   Defendants conduct described herein was oppressive, malicious, and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause Plaintiffs, to suffer humiliation, mental anguish, and emotional and physical distress.

147.   Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages in an amount to be determined by the Court.

## SECOND CAUSE OF ACTION

### VIOLATION OF PENAL CODE 647.6(a)(1)

*(Against All Defendants and Does 1-10)*

148.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

149.  California Penal Code § 647.6(a)(1) provides that "[every person who aims or molests any child under 18 years of age shall be punished by a fine not exceeding five thousand dollars ($5,000), by imprisonment in a county jail not exceeding one year, or by both the fine and imprisonment."

150.  As alleged herein, Defendants engaged in sexual penetration with Plaintiffs while Plaintiffs were under eighteen years of age, in violation of California Penal Code § 647.6(a)(1).

151.  Under California law, victims of childhood sexual abuse are entitled to bring civil actions for violations of Penal Code provisions that prohibit adults from engaging in sexual acts with minors, including Penal Code § 647.6(a)(1). See Angie M. v. Superior Court, (1995) 37 Cal.App.4th 1217, 1224-1225.

152.  Defendants above-noted actions in annoying and molesting the minor Plaintiffs was the proximate and legal causes of physical, psychological, emotional, and economic damages Plaintiffs have suffered and continues to suffer to this day. It also has resulted in Plaintiffs incurring, and will require Plaintiffs to incur into the future, expenses for medical and psychological treatment, therapy, and counseling.

153.  The above-described conduct of Defendants was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety of Plaintiffs, and was carried out with a conscious disregard of Plaintiffs right to be free from such tortious behavior, such as to constitute oppression, fraud or malice pursuant to California Civil Code section 3294, entitling Plaintiffs to punitive damages against Defendants in an amount appropriate to punish and set an example of them.

### **THIRD CAUSE OF ACTION**

### **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

*(Against All Defendants and Does 1-10)*

154.  Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of

1    action.

2       155.   The conduct of all Defendants as set forth in this Complaint was extreme

3    and outrageous, and committed with the intention of causing, or reckless disregard of

4    the probability of causing, emotional distress.

5       156.   A reasonable person would not expect or tolerate the sexual assault

6    committed by Defendants.

7       157.   A reasonable person would not expect, accept or tolerate Defendants'

8    unlawful sexual assault and/or sexual abuse, and molestation of Plaintiffs.

9       158.   Defendants' conduct exceeded all bounds of that usually tolerated in a

10   civilized community.

11      159.   Defendants intended to cause Plaintiffs injury when they sexually

12   assaulted Plaintiffs, manipulated and brainwashed Plaintiffs into silence and actively

13   concealed Plaintiffs' abuse.

14      160.   Plaintiffs have suffered severe and/or extreme distress as a result.

15      161.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered

16   harm including, but not limited to, physical, mental, and emotional injuries of

17   childhood sexual abuse and molestation; was caused to incur medical and other

18   expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all

19   such damages in the future, and other damages, in an amount not yet ascertained, but

20   which exceed the minimum jurisdictional limits of this Court.

21      162.   Defendants' conduct described herein was oppressive, malicious and

22   despicable in that it was intentional and done in conscious disregard for the rights and

23   safety rights of Plaintiffs, and with the substantial certainty that it would cause

24   Plaintiffs, to suffer humiliation, mental anguish and emotional and physical distress.

25      163.   Defendants' conduct as alleged constitutes malice and oppression under

26   California Civil Code section 3294. Plaintiffs are, therefore, entitled to the recovery of

27   punitive damages, in an amount to be determined by the Court.

28   / / /

# FOURTH CAUSE OF ACTION

## NEGLIGENT HIRING, SUPERVISION, AND RETENTION

*(Against All Defendants and Does 1-10)*

164.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

165.   At all times relevant, a special relationship existed between Defendants and Defendants, because Defendants were the agents of Defendants, each of whom had the ability to control of Defendants' conduct, yet failed to exert it. In doing so, Defendants created a widespread culture of acceptance of the abuse of children, as Defendants and Defendants collectively brainwashed and manipulated Plaintiffs to remain silent about the abuse and these Defendants also actively concealed the abuse to avert discovery by the authorities.

166.   At all times herein. Defendants, and each of them, negligently supervised, managed, and controlled Defendants in their membership and participation in Defendants' Church, and negligently failed to warn Plaintiffs, Plaintiffs' parents, and other members of the Church, of the propensity and risk that Defendants would sexually assault, sexually abuse, and/or molest minor children, a propensity and history of which Defendants, and each of them, acting through their employees, agents, and volunteers, had actual notice.

During the same time period, Defendants, and each of them, were negligent in failing to exercise reasonable care to protect Plaintiffs, and other minors, who were members of, or participants in, activities at Defendants' Church, from the risk of sexual assault, sexual abuse and molestation by perpetrators, including Defendants.

167.   Defendants were further negligent in failing to notify law enforcement and other appropriate authority that Plaintiffs were and/or continued to be a victim of child abuse/assault by Defendants when they learned of this fact. Defendants' failure to report the known and/or reasonably suspected child abuse of Plaintiffs, but instead

Defendants perpetuated and facilitated Defendants' continued sexual abuse and/or sexual assault, and molestation of Plaintiffs.

168. If Defendants satisfied their duty to take reasonable steps to protect Plaintiffs all minor children, from known and/or foreseeable harm, including sexual assault, including reporting the sexual assault and/or sexual abuse, and molestation to law enforcement, then some or all of the Plaintiff's injuries would have been avoided.

169. Prior to, during, and after the sexual assault of Plaintiffs, Defendants, through their administrators, employees, agents, and/or volunteers, had knowledge, and/or were otherwise on notice, that Defendants had and/or was engaged in, and/or presented the risk of, sexual assault of Plaintiffs, and other minors.

170. Plaintiffs are informed, believes, and thereupon alleges that prior to, and during Defendants' sexual assault and/or sexual abuse, and molestation of Plaintiffs, Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of Defendants' unlawful conduct, as set forth in this Complaint, but failed and/or refused to take any affirmative action, including but not limited to notifying law enforcement. Instead, Defendants directed Plaintiffs and Plaintiffs' parents to continue to have contact with Defendants thereby ratifying and facilitating Defendants' continued sexual assault and/or sexual abuse and molestation of Plaintiffs.

171. Defendants breached their duties by failing to use reasonable care to protect Plaintiffs from their pastor, deacon, employee, and/or agent, to wit, Defendants.

172. If Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against her and the resulting harm.

173. As a direct and legal result of Defendants' conduct. Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but

which exceed the minimum jurisdictional limits of this Court.

174.   Plaintiffs are informed, believes, and thereupon alleges that Defendants' failure to respond, investigate, terminate Defendants' employment, report, or take any other action following Plaintiffs, other minor children, and Plaintiffs parents' report of sexual assault and/or abuse by Defendants was part of Defendants' concerted effort to cover up and/or hide evidence related to childhood sexual assault of minor children, including Plaintiffs.

175.   Plaintiffs' damages as a result of Defendants' repeated sexual assault, abuse, and molestation of Plaintiffs was a direct result of Defendants' concealment and cover-up. As such. Plaintiffs are entitled to treble damages against Defendants pursuant to Code of Civil Procedure section 340.1(b)(2).

## **FIFTH CAUSE OF ACTION**

### **NEGLIGENT SUPERVISION OF A MINOR**

*(Against All Defendants and Does 1-10)*

176.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

177.   Defendants and McKean and Lucas (McKean and Lucas are collectively, the "Church Leader Defendants"), and each of them, were responsible for the care, custody, control, supervision, and protection of the minor children entrusted to them, including Plaintiffs.   Defendants and Church Leader Defendants had a duty to adequately and properly supervise, monitor, and protect Plaintiffs from known and knowable dangers, such as those posed by Defendants.

178.   Defendants and Church Leader Defendants, and each of them, breached their duty to properly and adequately supervise, monitor, and protect Plaintiffs, in part because officers, administrators, agents, and other supervisory employees knew or should have known of Defendants' improper behavior, including that minor children, including Plaintiffs, were frequently alone with Defendants without any justification,

that Defendants would frequently touch and sexually abuse minor children, including Plaintiffs, at Church Leader Defendants and Defendants' Churches without any justifiable reason for doing so, including when the minor children were by themselves, and Defendants sexually abused, assaulted, and/or molested minor children, including but not limited to Plaintiffs.

179. Defendants and Church Leader Defendants, acting through their administrative and supervisory employees, knew or should have known that Plaintiffs were unattended and unsupervised with Defendants on numerous occasions, without any justification.

It should have been obvious to any officer, agent, administrator, employee, or staff member that there was no reason that neither Plaintiffs, nor any other child, should have been alone with Defendants. The employees and agents of Defendants and Church Leader Defendants instead turned a blind eye to the fact that Defendants were spending time with minor children, including Plaintiffs, unattended and unsupervised without any investigation into the matter.

180. After engaging in grooming activity of Plaintiffs while spending time alone with Plaintiffs, Defendants started sexually assaulting, sexually abusing, and molesting Plaintiffs and other minor children on Defendants' premises and during Defendants and Church Leader Defendants' church related services. The acts of sexual assaults and abuse occurred while Plaintiffs were left unattended and unsupervised with Plaintiffs.

181. If Defendants and Church Leader Defendants, and each of them, adequately and properly supervised, monitored, and protected Plaintiffs, Plaintiffs would not have been harmed, or would not have been harmed to the extent that Plaintiffs were.

182. Defendants and Church Leader Defendants, and each of them, also recklessly and negligently failed to implement and/or enforce policies and procedures that were aimed at preventing or detecting sexual assault and assault of their minor

members.

183. If Defendants and Church Leader Defendants, and each of them, adequately performed their duties and responsibilities, then Plaintiffs would not have been subject to the sexual assault, assault and harassment perpetrated by the Defendants.

184. Plaintiffs have been severely damaged emotionally and physically, and otherwise, in amounts to be proven at the time of trial, but which exceed the jurisdictional limits of the Superior Court as a direct and legal result of the acts and omissions of Defendants and Church Leader Defendants, and each of them.

## SIXTH CAUSE OF ACTION

### FAILURE TO REPORT SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE SECTION 11165. ET SEP. BASED ON VICARIOUS LIABILITY

*(Against All Defendants and Does 1-10)*

185. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

186. Defendants and Church Leader Defendants, through their administrators and employees knew or reasonably suspected that Defendants had, and or was, engaged in the sexual assault of children while the children were under the care, custody, and supervision of Defendants, and each of them, and thus had a duty to report Defendants to the appropriate authorities under the California Child Abuse and Neglect Reporting Law. (Penal Code §§ 11164-11174.3, "CANRA".)

187. At all times relevant herein and material hereto, Defendants were employees of Defendants and Church Leader Defendants. Defendants and Church Leader Defendants were responsible for hiring, training, supervising, and retaining Defendants as part of their church and youth bible studies program. Defendants and

Church Leader Defendants' staff, employees, and administrators were required to report any suspected child or sexual abuse as part of their duties and responsibilities as employees and/or agents of Defendants and Church Leader Defendants.

188. Defendants' and Church Leader Defendants' administrators, board members, and employees are mandated reporters under Penal Code section 11165.7.

189. Penal Code section 11166(a) states that a mandated reporter shall make a report to an agency whenever he/she, in his/her professional capacity or within the scope of his/her employment, has knowledge of or observes a child whom the mandated reporter knows, or reasonably suspects has been a victim of child abuse or neglect. "Reasonable suspicion" does not require certainty that child abuse or neglect has occurred but looks to if it is objectively reasonable for a person to entertain a suspicion to suspect child abuse or neglect. (Penal Code § 11 lr66(a)(l).)

190. As set forth in this Complaint, Defendants and Church Leader Defendants, through their administrators, board members, and employees knew and/or reasonably suspected that children had been sexually assaulted by Defendants, prior to Defendants' sexual assault of Plaintiffs, giving rise to a duty to report such conduct under CANRA.

191. Defendants and Church Leader Defendants, through their administrators, board members, and employees knew that in the absence of the exercise of reasonable diligence, that an undue risk to minors, including the Plaintiffs, existed because Defendants' administrators, board members, and/or employees did not comply with California's mandatory reporting requirements.

192. Defendants, through their administrators, board members, and employees, including but not limited to and Church Leader Defendants, failed to report the known and/or reasonably suspected child molestations and assaults, created the risk and danger contemplated by CANRA, and a result, unreasonably and wrongfully exposed Plaintiffs and other minors to sexual molestation and abuse,

193. If Defendants, through their administrators, board members, and

employees, including but not limited to the Church Leader Defendants, complied with CANRA's mandatory reporting requirements, then Plaintiffs would not have been harmed at all or to the extent that she was.

194.   As a direct result of Defendants and Church Leader Defendants' failure to comply with CANRA's mandatory reporting requirements, through their administrators, board members, and employees. Defendants and Church Leader Defendants wrongfully denied the Plaintiffs the intervention of child protection services and constituted a per se breach of Defendants, through their administrators, board members, and employees, duties to Plaintiffs.

195.   As a direct and legal result of Defendants and Church Leader Defendants' conduct, Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

## SEVENTH CAUSE OF ACTION

### NEGLIGENCE

*(Against All Defendants and Does 1-10)*

196.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

197.   Defendants owed a duty of care to the minor Plaintiffs or had a duty to control the conduct of Defendants by way of the special relationship existing between those individuals and Plaintiffs.

198.   Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of the misconduct and sexually predatory behavior of the Defendants directed towards minor children, including Plaintiffs.

199.   Despite having knowledge of the misconduct of Defendants, all

Defendants herein failed to take any preventative action to control, curb, and/or prevent that conduct, failed to warn Plaintiffs or Plaintiffs' parents of that wrongful conduct, and/or failed to notify law enforcement, despite having a legal duty to do so.

200.   As a direct and legal result of Defendants' negligence, Plaintiffs were sexually assaulted, sexually abused, sexually harassed, and assaulted by the Defendants.

201.   If Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against Plaintiffs and the resulting harm.

202.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and-future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

## **EIGHTH CLAIM FOR RELIEF**

**Violation of Federal Racketeer Influenced and Corrupt Organization ("RICO") Act 18 U.S.C. § 1962(c)**

*(Against All Defendants and Does 1-10)*

203.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

204.   Plaintiffs bring this claim for relief under the private cause of action provided by 18 U.S.C. § 1984(c), which prohibits violations of the Federal RICO Act insofar as such violation injures any person in his business or property.

205.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

206.   The Abuse Enterprise, distinct from Defendants, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), organized within individual ministries, funneling into regions governed by individual bishops, and headquartered in Los Angeles, California.  Members of the Abuse Enterprise maintain a common purpose of extracting money from its members and perpetrating sexual abuse upon minor children under the auspices of liturgical praxis and writings taught by its church ministers worldwide. The Abuse Enterprise began as early as 1979 and continues with a growing global membership of more than 120,000 today.

207.   Defendants have conducted and participated in the affairs of the Abuse Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

208.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts: sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260.

209.   Each Defendant, in their individual capacity, knew or should have known about the majority of the predicate acts carried out by Defendants within the Abuse Enterprise.

210.   Upon information and belief, some combination of Defendants have engaged in an uninterrupted course of unlawful conduct consisting of all of the herein described predicate acts.

211.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts:  (i) violating the prohibition against human trafficking under 18 U.S.C. § 1590; (ii) laundering of monetary instruments outside of the United States with the intent to promote the carrying on of unlawful activity in violation of 18 U.S.C. §1956(a)(2); and (iii) sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260 Upon information and

belief, several hundred children have been sexually exploited as a result of this pattern of racketeering behavior.

212.   Upon information and belief, hundreds of individuals within Defendants' inner circles have been extorted through fear of financial and physical injury into making large financial payments to Defendants and into providing sexual services to Defendants as a result of this pattern of racketeering behavior.

213.   Upon information and belief, many millions of dollars have been trafficked out of the United States for the purposes of carrying on unlawful activity as a result of this pattern of racketeering behavior.

214.   Upon information and belief, Defendants' pattern of racketeering behavior has been related and continuous since its inception.  Upon information and belief, there is not only a threat of continued criminal activity, but continued criminal activity is occurring within the Abuse Enterprise at the hands of nearly all Defendants as of the writing of this Complaint.

215.   Defendants and the Abuse Enterprise regularly move goods, money, and people across state lines, and are therefore engaged in interstate commerce.

216.   As a direct and proximate result of these patterns of racketeering behaviors, Plaintiffs have sustained damages, including lost wages, loss of economic opportunity, loss of educational opportunity, loss of future income, loss of specific extorted payments, physical injury, severe emotional distress, and additional economic losses.

217.   Plaintiffs are therefore entitled to recover treble the damages she sustained in an amount to be proven at trial, the cost of the suit, plus a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

/ / /

/ / /

/ / /

/ / /

## NINTH CLAIM FOR RELIEF

### Sexual Battery in Violation of Cal. Civ. Code § 1708.5

*(Against All Defendants and Does 1-10)*

218.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

219.   Plaintiffs bring this claim for relief under Cal. Civ. Code Section 1708.5, which prohibits sexual battery.

220.   Plaintiffs bring this claim pursuant to California Assembly Bill 218, amending Sections 340.1 and 1002 of the Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.

221.   As alleged herein, Plaintiffs the victim of sexual battery as a minor perpetrated by Defendants. Defendants subjected Plaintiffs to this sexual battery at the hands of while Plaintiffs were minors.

222.   Cal. Civ. Code § 1708.5 prohibits any act with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with the person results, or any act that causes an imminent apprehension of such harmful or offensive contact and the offensive contact results.

223.   Defendants knowingly conspired and/or aided and abetted to force Plaintiffs into sexual battery with Defendants, and such sexual battery did, on multiple occasions, occur.

224.   Plaintiffs were minors minor when Defendants sexually battered them.

225.   Each Defendant knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with Defendants, all in furtherance of

sexually battering Plaintiffs and in furtherance of the Abuse Enterprise.

226.   The sexual battery of Plaintiffs by the Abuse Defendants was the result of Defendants' collective cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

227.   As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

228.   The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety as a minor in their care.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

229.   Plaintiffs are therefore entitled to recover treble the amount of damages they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees, and other relief that the Court may deem proper.

## **TENTH CLAIM FOR RELIEF**

### **Gender Violence in Violation of Cal. Civ. Code § 52.4**

*(Against Defendants and Does 1-10)*

230.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

231.   Plaintiffs bring this claim for relief under Cal. Civ. Code Section 52.4, which prohibits acts of gender violence.

232.   Plaintiffs bring this claim pursuant to California Assembly Bill 218, amending Sections 340.1 and 1002 of the California Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished

claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.

233.   As alleged herein, Plaintiffs were the victims of multiple instances of sexual battery as a minor perpetrated by Defendants and facilitated by all Defendants herein.  Defendants subjected Plaintiffs to these multiple incidents of sexual battery at the hands of Defendants while Plaintiffs were minors.

234.   Cal. Civ. Code § 52.4 prohibits commission of acts of gender violence, defined to include a physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

235.   As alleged herein, Plaintiffs were repeatedly the victim of acts of gender violence by Defendants while they were minors.

236.   Each Defendant herein knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with Defendants, all in furtherance of committing acts of gender violence against Plaintiffs.

237.   The repeated sexual battery of Plaintiffs by Defendants was the result of Defendants' collective cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

238.   As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

239.   The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety as a minor in their care. Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

240.   Plaintiffs are therefore entitled to recover treble the amount of damages

they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees and other relief that the Court may deem proper.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE Plaintiffs respectfully pray for relief as follows:

    (a)    Compensatory and special damages in an amount to be proven at trial;

    (b)    Statutory penalties and liquidated damages according to proof at time of trial;

    (c)    Punitive and exemplary damages in an amount according to proof at the time of trial;

    (d)    Treble damages;

    (e)    Pre- and post- judgment interest;

    (f)    Reasonable attorney's fees and costs; and

    (g)    Such other and further relief as the Court deems just and proper.

Plaintiffs respectfully demand a trial by jury on all claims so triable.

**SAMINI BARIC KATZ LLP**

Date: June 16, 2023    By:   /s/ Bobby Samini

Bobby Samini, Esq.
Michael Katz , Esq.
Steve Baric, Esq.
Nicole C. Prado, Esq.
John S. Oney, IV, Esq.
*Attorneys for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PROOF OF SERVICE**

STATE OF CALIFORNIA)
COUNTY OF ORANGE)

     I am employed in Orange County.  My business address is 650 Town Center Drive, Suite 1500, Costa Mesa, CA 92626, where this mailing occurred.  I am over the age of 18 years and am not a party to this cause.  I am readily familiar with the practices of SAMINI BARIC KATZ LLP for collection and processing of correspondence for mailing with the United States Postal Service.

     Such correspondence is deposited with the United States Postal Service the same day in the ordinary course of business.

     On June 16, 2023, I served the foregoing documents on the interested parties in this action entitled as follows:

**FIRST AMENDED COMPLAINT**

**SEE ATTACHED SERVICE LIST**

[ ]    (**BY MAIL**) I placed such envelope for collection and mailing on this date following ordinary business practices.

[ ]    (**BY PERSONAL SERVICE**) I caused to be hand delivered such envelope to the addressee so indicated.

**[XX] (BY THE COURT'S ECF SYSTEM)**:  I caused each such document(s) to be transmitted electronically by posting such document electronically to the ECF website of the United States District Court for the Central District of California, on all ECF-registered parties in the action.

[]    (**BY EMAIL**) I caused the above-referenced document(s) to be sent in electronic PDF format as an attachment to an email addressed to the person(s) on whom such documents(s) is/are to be served at the email address(es) shown above as last given by that person(s) or as obtained from an internet website(s) relating to such person(s), and I did not receive an email response upon sending such email indicating that such email was not delivered.

[XX] (**FEDERAL**) I declare that I am employed in the office of a member of the bar of this court at whose direction the services was made.

     Executed on June 16, 2023, at Costa Mesa, California.

                                 */s/ Griselda Alfaro*
                                   Griselda Alfaro

1

**SERVICE LIST**

2

| | |
|---|---|
| Andrew J. Waxler, Esq.<br>John T. Lupton, Esq.<br>Madeleina Halley, Esq.<br>Tad A. Devlin<br>KAUFMAN DOLOWICH &<br>VOLUCK, LLP<br>21515 Hawthorne Blvd., Suite 450<br>Torrance, CA 90503<br>Telephone: 310-525-9720<br>Fac: 805-388-3414<br>awaxler@kdvlaw.com<br>jlupton@kdvlaw.com<br>mhalley@kdvlaw.com<br>tdevlin@kdv.com | *Attorneys for Defendant, HOPE*<br>*WORLDWIDE, LTD.* |
| Mindee J Stekkinger<br>Molly M. Loy<br>Thomas E. Beach<br>BEACH LAW GROUP LLP<br>500 East Esplanade Drive, Suite 1400<br>Oxnard, CA 93036<br>Telephone: 805-388-3100<br>Fax: 805-388-3414<br>mail@beachlawgroup.com<br>molly@beachcowdrey.com | *Attorneys for Defendant, THE*<br>*INTERNATIONAL CHRISTIAN*<br>*CHURCH, INC.* |
| James A. Harris<br>MANNING AND KASS ELLROD<br>RAMIREZ TRESTER LLP<br>801 South Figueroa Street 15th Floor<br>Los Angeles, CA 90017-3012<br>Telephone: 213-624-6900<br>Fax: 213-624-6999<br>Email:<br>jimmy.harris@manningkass.com | *Attorneys for Defendant, NORTH*<br>*RIVER CHURCH OF CHRIST* |
| Alan K. Brubaker<br>Ian R. Friedman<br>WINGERT GREBING BRUBAKER<br>& JUSKIE LLP | *Attorneys for Defendant, Alberto*<br>*Shcirmer and Ana Maria Schirmer* |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| 600 West Broadway, Suite 1200<br>San Diego, CA 92101<br>Telephone:  619-232-8151<br>Fax:  619-232-4665<br>Email: abrubaker@wingertlaw.com<br>         ifriedman@wingertlaw.com<br>         tneuhoff@wingertlaw.com | |
| Byron J. Mclain<br>Savannah Levin<br>FOLEY & LARDNER LLP<br>555 South Flower Street, Suite 3300<br>Los Angeles, CA 90071-2418<br>Telephone:  213.972.4500<br>Facsimile:    213.486.0065<br>Email:  347929slevin@foley.com<br>         257191bmclain@Foley.Com | *Attorneys for Defendant, Al Baird* |

FIRST AMENDED COMPLAINT